**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| PAUL POWELL, | : |
| | : |
| Petitioner, | : |
| | : Case No. 3:05-CV-647 |
| v. | : |
| | : (Judge Kosik) |
| JAMES WYNDER, et al., | : |
| | : |
| Respondents. | : |

---

| | |
|---|---|
| ROBERT POWELL, | : |
| | : |
| Petitioner, | : |
| | : Case No. 3:05-CV-648 |
| v. | : |
| | : (Judge Kosik) |
| JAMES WYNDER, et al., | : |
| | : |
| Respondents. | : |

---

## **MEMORANDUM**

Petitioners in this action are Robert Powell ("Robert") and Paul Powell ("Paul") (collectively, the "Powells"), brothers, who were each convicted of first-degree murder, among other charges, in the homicide of Roy Myran.  Each brother was sentenced to life in prison after a bench trial in the Court of Common Pleas of Luzerne County, Pennsylvania.  Before us are the petitioners' objections to the Magistrate Judge's Report and Recommendation of June 18, 2007, regarding their petitions for writs of habeas corpus under 28 U.S.C. § 2254.[1]  For the reasons that follow, we will deny the petitions.

---

[1] 28 U.S.C. § 2254(a) provides:

(a) [A] district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

<h2 style="text-align:center">Background</h2>

The information needed to comprehend the claims in these habeas petitions goes beyond the evidence presented at trial.  We will detail the history of this case, noting pre-trial issues, evidence presented at trial, post-conviction relief, post-conviction hearings, and the record in these habeas proceedings, and excerpt from the record as we see fit.

**I.      Direct State Court Proceedings**

On February 6, 1990, the brothers were arrested for, among other charges, the murder of Roy Myran.  The brothers were released on bail for nineteen months before trial, which was held from September 30, 1991 to October 7, 1991.  Despite a motion to sever their trials, the brothers were tried together.

Prior to trial, the brothers made decisions with the counsel of their attorneys regarding trial strategy that are at issue in these petitions.  First, the brothers waived a jury trial.  On September 25, 1991, the day that jury selection started, counsel for Robert Powell informed the court of the following:

> [W]e have engaged in extensive discussions with our clients, both individually and separately.  After engaging in these discussions with our clients, allowing our clients to speak between themselves, simply Paul and Bob, and also having the benefit of having our clients consulting with their mother and father who are present here in court, a determination has been made, Your Honor, that certainly on behalf of Robert, and I believe it's fair to say on behalf of Paul, both individuals would wish to waive their right to a jury trial and proceed with the Court trying the matter.
>
> We, both Attorney Saporito and I, again, both individually to our clients and with both present, have indicated what the law is in this area.  We have indicated their rights in both situations with jury trial and nonjury.  With all those considerations we believe being understood and expressed clearly, again, Your Honor, it is the wishes of both individuals to proceed to waive their Constitutional Right to a jury trial and to proceed with a bench trial.
>
> Very importantly, Your Honor, we spent much time discussing the fact that this Court has heard extensive pretrial motions.  I believe we had at least four or five days in which these motions were litigated.  Both Robert and Paul understand that the Court has heard facts; they understand that certainly some of the facts the Court has heard would not be heard by a jury.  The Court has

2

> suppressed the statement of Officer Jacob; the Court has
> suppressed the fruits of the search warrants which were executed
> on February 5th or 6th; and, the Court has made a provisional
> motion regarding certain statements attributed to Paul, also by
> Paul's estranged wife Dorothy.
>
> With all that in mind, Your Honor, that the Court has heard this, it
> is still our clients wish to waive the Jury trial.  They do understand
> that the Court has heard these matters, and even in light of that it is
> their wish to waive jury trial and it is their sense that the court will
> extend all appropriate fairness and consideration in this matter.

N.T. 141:24–143:5.  Prosecutor Marsilio also added that the judge had reviewed photographs not

admissible into evidence, and that "the Defendants should be aware of that and understand that

they suffer no prejudice as a result."  N.T. 143:10–:22.  We note that the trial judge had

previously determined that the brothers were not intoxicated when they were taken into custody

the evening of February 5, 1990, in response to a pre-trial motion.  Judge Cappellini proceeded to

inform the brothers of their right to a jury trial, and to question them to ensure that their waiver

was knowing, intelligent, and voluntary, pursuant to Pennsylvania Rule of Criminal Procedure

1101.[2]  N.T. 144:5–164:8.  Both brothers also executed written waivers.[3]  N.T. 162:2–:23.

Second, because Charles Eckhart, an eye-witness who could identify the brothers would

testify, the brothers decided to take the stand in their defense to explain the evening's events.

The brothers decided to use an intoxication defense to mitigate the first-degree murder charge.[4]

At least two pre-trial hearings were held.  One pre-trial hearing was held on February 5,

1991, and one was held a few days before trial on September 23, 1991. We received the

transcript for the September 23 pre-trial hearing as part of the record, however we were not

presented with a transcript of the February 5 hearing.  Because we felt it was in the interest of

---

[2]On March 1, 2000, Rule 1101 was renumbered to become Rule 620.

[3]The brothers attacked in state court whether their waiver of jury trial was knowing,
intelligent, and voluntary.  See Commonwealth v. Powell, Nos. 1990-904/5, slip op. at 7
(Luzerne Cty. Ct. Oct. 18, 2000).  The brothers did not raise this issue in their habeas petitions.

[4]According to the trial counsel of the Powells, the trial counsel felt that a judge would
understand and apply an intoxication defense better than a jury, despite Judge Cappellini's pre-
trial ruling regarding intoxication.

justice to have that transcript to understand the predicate events that gave rise to this petition, we asked the parties to supply it to us, and they did.

Motions to suppress were argued and decided at the pre-trial hearings. Their adjudication was raised in the direct appeal, but is not at issue in these habeas petitions.

During the pre-trial hearing on September 23, the parties argued a motion to suppress the identification of the brothers. During the hearing, the defense cross-examined Charles Eckhart, eye-witness for the prosecution. Judge Cappellini decided to have the cross-examination in camera for the portion of the examination that related to Eckhart's drug convictions and possible drug use. The following testimony occurred in camera:

> Q.      The charge to which you pled guilty was just drug trafficking?
>
> A.      Trafficking and cocaine.
>
> Q.      Have you had any discussions with the police department or the Luzerne County District Attorney's Office concerning your present charges?
>
> A.      No.
>
> Q.      Has anyone from the Wilkes-Barre Police Department or the office of the District Attorney of Luzerne County contacted the prison in Florida concerning these charges?
>
> A.      Not that I know of.
>
> Q.      Has anyone ever contacted either a parole board or the law enforcement authorities that arrested you in Florida or any other agency of any kind concerning your participation in this case?
>
> A.      No.

N.T. 32:24–33:17.

> Q.      [Y]ou indicated you are presently serving time regarding a cocaine trafficking charge. Did you go to trial and were convicted or was it a guilty plea?
>
> A.      I went to trial.
>
> Q.      And was it a jury trial or a bench trial?
>
> A.      Jury trial.

Q.      [Y]ou mentioned . . . a 15 year sentence, is that a mandatory minimum sentence?

A.      Yes, it is.

Q.      Is there parole available to you upon the service of a particular amount of time, if you know?

A.      No, but there's what they call, good time, down there. What it works out to is if I don't get into any trouble it will be six years and one month is the best time I can get out.

Q.      Is that as a result of good time?

A.      Yes, it is, just 20 days a month they give you.

Q.      Would it be fair to say that the Florida parole people have control over the amount of good time that you're granted?

A.      I think there's stipulations as to a drug charge.  I'm only eligible for the 20 days, none of the extras.
                                    . . .

Q.      Would it be fair to say that that call, as to whether you would get five or ten or 15 or 20, would be determined by the Florida parole authorities?

A.      Yes, it is.
                                    . . .

Q.      [I]t would be fair to say then that you have the potential of reducing your sentence by more than half presuming the good time?

A.      Yes.

Q.      Are we agreeing that there would be some discretion, to your knowledge, in the Florida parole department, as to how much good time you would be awarded?

A.      Not really, except that I'm only eligible for 20 days.

Q.      What I'm trying to get at, Mr. Eckhard, is that the 20 is not a guarantee, it would be perhaps five or ten or fifteen?

A.      Oh yes.  If you screw up they take it off you.

Q.      When you say they take it off you I am presuming again that the parole people have some control over this?

A.      The prison officials.

5

. . .

Q.      Would it be fair to say that the, if you know, that the parole or prison officials could consider other things in your life as far as your qualification for a certain amount of good time?

. . .

A.      I don't know.

. . .

Q.      [Y]ou testified that the charges, the Florida charges were pending against you on February 5th of '90 when this shooting occurred, correct?

A.      Correct.

Q.      When was the charge originally filed, if you know?

A.      I was originally arrested May of 1989.

Q.      And you were on bail from May of '89 until your case was going to come up in Florida?

A.      Until February of '91.

Q.      I realize that you're—I believe it was your testimony that the charges you were found guilty of was trafficking and cocaine. Were you using cocaine at the time, let's say around February of 1990 when this incident occurred, just as the general time frame?

A.      No, I was not.

[Whereupon the trial judge limited testimony regarding Eckhard's possible drug use.]

The Court:      Let me just ask something.  He may not have been charged with it, you may be asking him something that could incriminate him.  Trafficking and using could be two different things, that's a different issue.  He's not represented and I won't permit him to answer that.

. . .

The Court:      You are again asking something that I have no way of answering at the moment.  I don't understand what the charges were.  The charges, as I understand, were trafficking.  You are now asking him something else that may deal with him incriminating himself on the use of cocaine for which he hasn't been charged, and the statute probably hasn't run.  And depending on what happens in this case it may very well devolve upon the District Attorneys here to make it known to the officials in Florida.

. . .

6

Q.      Were there any other charges presented to the Jury during your trial?

A.      Conspiracy.

. . .

Q.      Were you also found guilty of the conspiracy?

A.      Not in the same amount.

. . .

A.      The charge was trafficking in excess of 400 grams and I was found guilty of trafficking, not guilty of conspiracy, but then there was a lesser charge of conspiracy to possess cocaine or less than one gram.

Q.      So there was a finding of guilt then on the possession of less than one gram, conspiracy to possess less than one gram you were also found guilty on?

A.      Yes.

. . .

Mr. Nocito: Your Honor, if we were out in the courtroom I'd ask for a side bar, perhaps off the record.

[Whereupon, an off-record discussion occurred.]

The Court:      You have a right not to answer that question because that question can incriminate you, it may turn out that you can be charged later, and if you're not represented by counsel . . . it's up to you, but I'm telling you now.  I don't know what's going to happen in this case, I don't know the end result and it may turn out that if you indicate that you were in possession of an illicit, illegal drug different from what we're discussion in your case in Florida, it may be that the authorities will proceed to let that be known to the appropriate authorities and you then may have another case against you.  Besides, you may then have another problem with your good time.  So I'm telling you that's the problem, and at this point if you're not represented I'm not going to permit the question.

N.T. 43:7–46:16.  Some in camera discussion was held off the record, as shown by the transcript.

Trial was held from September 30 to October 7, 1991.  The Superior Court of Pennsylvania (the "Superior Court") adopted the trial court's summary of facts surrounding the homicide, which are as follows:

On February 5, 1990, Paul and his brother, Robert, arrived at Jones' Bar on Wood Street in Wilkes-Barre, Pa., at approximately

6:10 p.m.  The owner of the bar, Terry Jones, the sole bartender on duty during the night in question, testified that he served Robert and Paul three seven-ounce bottles of beer and a shaker of Kamikazes which they shared with their younger brother, Joseph Powell, while playing pool in the bar.

At approximately 7:00 p.m. or 8:00 p.m. that evening, Paul started a fight with another patron which led to Jones holding Paul down on the floor to calm him down.  Robert punched Jones.  Thereafter, Roy Myran and Kenneth Kuras grabbed Robert in order to keep him from fighting further with Jones and led him out of the car; after being ejected from the bar, Robert removed a metal object from the trunk of his car and Jones locked the bar's door and called the police.  Robert began pounding on the exterior of the building and did damage to the building with the metal object; Robert also tapped on a neighbor's car window and hit the neighbor, Robert Arnold, in the head.

Once the police arrived, Robert and Paul were taken into custody and cited for Public Drunkenness and Disorderly Conduct and Robert was also cited for Criminal Mischief.  Robert and Paul later were released by the police into the custody of their brother, Anthony Powell.

After leaving the police station, Robert and Paul returned to Robert's apartment in Wilkes-Barre and consumed drinks containing Jim Beam Bourbon and Pepsi Cola.  While there, they decided to return to Jones' Bar so Paul could have a "fair fight." Robert went to his closet and took out a rifle and ammunition and joined Paul in Paul's car in which Paul drove them back to the bar.

Although during their earlier visit to the bar they had parked in the bar's parking lot adjacent to the building, upon their return to the bar, Paul parked his car at the corner of Oregon & Wood Streets, Wilkes-Barre, Pa., before reaching the bar, and walked down a narrow and dark passageway to get to the back of the bar, thus avoiding the entrance to the bar itself.

Upon reaching the rear of the bar shortly before 10:30 p.m., Robert told Paul to go get "the guys you had the problem with" while Robert loaded the rifle.

At approximately 10:30 p.m., Myran, Kuras, Charles Eckhart and Mark Hannigan were leaving the bar and noticed Paul standing near Kuras' truck in the parking lot of the bar.  Kuras walked toward his truck and made direct eye contact with Paul.  Paul ran around the back of the bar.  Myran and Eckhart were following Kuras at the time.  Kuras found Paul standing against the far side of the building and a brief dialogue took place.  Thereafter, Kuras began to walk back to the bar to tell Jones that Paul had returned. As Kuras passed the stairs at the back of the bar, which were outside the range of the parking lot spotlight, he heard a gunshot,

saw a flash, and saw Myran fall after being shot by a bullet, as did
Eckhart.  Eckhart testified that after he saw the shoulder-high flash
come from under the stairs, he saw Robert step out from under the
dark stairs into the lighted area with a rifle.

Kuras ran and slipped on a set of Bilco doors leading to the
basement of the building and as he fell he felt a bullet pass very
nearby; Robert and Paul fled the scene and climbed over a six-foot
high fence adjacent to the bar property with the weapon; Paul
drove them toward Tunkhannock, Pa., to talk to their cousin,
Michael Simon, about being their alibi for the evening.  While on
the Cross Valley Expressway enroute to Simon's house, Paul
stopped the car so that Robert could throw the rifle and his torn
shirt into the Susquehanna River.  After an unsuccessful throw,
Robert succeeded in discarding the incriminating items.  Robert
and Paul decided to call Simon from home instead regarding their
alibi and returned to their house; Robert was observed entering the
house through the cellar stairs.  Subsequently, Robert and Paul
were taken into custody at their home at approximately 11:45 p.m.
The brothers were arrested at the Wilkes-Barre Police Station at
approximately 1:30 a.m. on February 6, 1990, and both were
charged with Criminal Homicide and Criminal Conspiracy.  Robert
was also charged with Criminal Attempt to Commit Criminal
Homicide.

Commonwealth v. Powell, 1581 MDA 2002, slip op. at 1–3 (Pa. Super. Ct. Oct. 29, 2003).

At trial, the judge ruled that defense counsel could not cross-examine Eckhart regarding

his drug conviction and his potential for good time to reduce his prison sentence, that the prior

testimony from the September 23 pre-trial hearing concerning his conviction and good time

would be incorporated into the record for that purpose, and that defense counsel could not argue

the testimony in closing.  N.T. 483:20–486:21.  The relevant discussion is as follows:

The Court:     For the purposes of this record, there's a motion in
limine by the Commonwealth that the Defendants counsel not be
permitted to pursue any questions concerning this particular
witness's conviction for drug trafficking and the fact that he is
presently serving a sentence in Florida where the offense occurred.
The sentence is—the sentencing is for a period—it's not minimum
or maximum, it's 15 years.  And during the hearing in chambers
last week it was determined that for good behavior he will have 20
days a month credited to his sentence, which means that the
maximum sentence would be six plus years.

The issue to be resolved is whether defense counsel may pursue
questions concerning his conviction and whether there has been
any favoritism shown to this particular witness by the authorities in
Pennsylvania or whether in the future, depending on his testimony

9

here, whether the authorities here would be inclined to write down to the institution in Florida in the event this particular witness needs any help with any problems he may have down in Florida.

Rather than having this brought out in open court, which will serve no purpose, particularly since there's no jury, and; secondly, since I am already aware of it, we are putting it on the record now that counsel for the Defendant would be permitted to examine this witness on the basis that I have just discussed on the record.  Is that fair enough?

Mr. Hughes:    That they already have —

The Court: No, I say they will not be permitted to do it here, it's already been done in chambers.

Mr. Hughes: It's already been done.

The Court: So that he's protected on the record as if it were done here at this hearing because that hearing is not this hearing.

Mr. Nocito: If we can perhaps, Your Honor, just indicate, if the Court thinks this is fair and Commonwealth counsel as well, that the testimony in the prior proceeding just be incorporated for the purposes of this limited issue.

The Court: Fine.  Okay.  So that we're doing it on the basis that it's part of the record, but farther than having it brought out on this — off the record.[5]

N.T. 484:2–486:2.

On October 8, 1991, Judge Cappellini found Robert guilty of first-degree murder, two counts of criminal conspiracy, and criminal attempt to commit murder, and he found Paul guilty of first-degree murder and two counts of criminal conspiracy.  Judge Cappellini read the verdict into the record, and stated that he would not explain his reasoning for the verdict.  The brothers both received life in prison for the first-degree murder convictions.

After trial, both brothers moved to arrest judgment for insufficient evidence or for a new trial.  The trial judge disposed of their motions in an opinion dated April 12, 1993.  See Commonwealth v. Powell, Nos. 1990-904/5 (Luzerne Cty. Ct. Apr. 12, 1993) [hereinafter Trial

---

[5]The motion in limine was made off the record, and we assume that defense counsel also objected off the record.  Neither party has argued otherwise.

Ct. Op.].  In the opinion, the trial judge discussed each brother's grounds for relief, and explained his conclusions regarding the evidence under the relevant law.  The judge addressed Paul's contention that the evidence was insufficient to inculpate him in complicity or conspiracy with Robert's first-degree murder of Roy Myran.  The judge denied the motions because he found that, under the totality of the circumstances, the verdict rendered was proper and was not contrary to the weight of the evidence.  See Trial Ct. Op. at 30–31.

After the judgments of sentence were imposed, the brothers timely appealed the judgment to the Superior Court.  By opinion dated January 17, 1995, the Superior Court affirmed the judgment of the Luzerne County Court.  See Commonwealth v. Powell, Nos. 3249, 3257 Philadelphia 1993 (Pa. Super. Ct. Jan. 17, 1995).  The Superior Court found that the trial judge properly disposed of all issues in his April 12, 1993 opinion that had been complained of on appeal.[6]  The brothers petitioned for reargument, which the Superior Court denied on March 29, 1995.  The brothers then petitioned the Supreme Court of Pennsylvania for an allowance of appeal, however the Supreme Court denied the petitions by order dated September 15, 1995.  See Commonwealth v. Powell, 665 A.2d 469 (Pa. 1995) (table decision).

## II.    Collateral State Court Proceedings

The brothers then sought relief under the Pennsylvania Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541–9546.  To prepare for their PCRA petitions, they requested the prison record of Charles Eckhart, the eye-witness who had provided key testimony for the prosecution.  In the prison record, the brothers discovered that a cooperation agreement between Eckhart and the prosecution may have existed and been withheld from them, and that Eckhart may have perjured himself regarding the existence of the cooperation agreement.

The brothers discovered more specific information regarding the alleged agreement.  At the time of trial, Eckhart was a Florida prisoner incarcerated for a drug conviction.  As a Florida

---

[6]In addition, the Superior Court found that the defendants waived their objection to the trial court's denial of their pre-trial motion to suppress the fruits of the searches of their persons because the objection was not raised at the suppression hearing.

prisoner, Eckhart could earn "gain time" (used to secure an earlier release date) for time served. A prisoner can earn four days of gain time per month for good behavior, and sixteen days of gain time per month for presence in the prison, for a total of twenty days for each month served. A prisoner cannot earn those sixteen days of gain time if he is not in Florida's custody. Eckhart's ability to earn gain time was frustrated during trial in Pennsylvania because he was not in Florida's custody. To ameliorate the effects of Eckhart's testimony (and presence) in Pennsylvania, the prosecution apparently agreed to contact Florida correctional authorities. Letters contained in the prison file memorialize the alleged agreement. One letter written by Assistant District Attorney Marsilio, who also first-chaired the trial, was written before trial and before the September 23, 1991 pre-trial hearing:



OFFICE OF THE
DISTRICT ATTORNEY OF LUZERNE COUNTY

CORREALE F. STEVENS
DISTRICT ATTORNEY



COURT HOUSE
WILKES-BARRE, PENNSYLVANIA 18711
(717) 825-1671 - 820-1676

June 5, 1991

WARDEN
Hendry Corr. Institution
RR 2, #13A
Immokalee, FL 33934

Re: Charles Eckhart
    Inmate #190478

Dear Warden:

This letter is in reference to the above individual who is currently confined at your institution. As you are aware, Mr. Eckhart is a material witness in the Commonwealth of Pennsylvania in which two individuals await trial on homicide charges.

Mr. Eckhart has asked authorities of this state to communicate his cooperation to your state authorities. Mr. Eckhart was advised that we would inform the appropriate officials of your state as to his cooperation, however, he understands no promises have been made, and any consideration by your state would be at the sole discretion of your state.

Mr. Eckhart has been, and indicated he will continue to cooperate in the prosecution of said individuals. Any possible consideration, whether, by your facility, or any Parole authorities that can be given regarding Mr. Eckhart's cooperation in this state would be appreciated. Please inform Charles of this correspondence so he knows we upheld our part of our agreement.

Thank you for your time and attention in this matter.

Sincerely,

Thomas M. Marsilio, Esquire
Assistant District Attorney

12

Doc. 6, p. 29, No. 05-cv-648.  Detective Capitano wrote letters to Mr. Luttman and Judge Frenza, of Florida, on February 11, 1992 and August 10, 1992, respectively.  In addition, Detective Andreoli wrote a letter to Judge Frenza on August 13, 1992.  Those letters detail Eckhart's crucial role in the trial as the sole eye-witness.  The prosecution states that the agreement was made to report Eckhart's good behavior in Pennsylvania so that he could still earn four days of gain time per month.

The brothers also discovered that Eckhart's original charges were for trafficking 400 grams of cocaine, but that he was only convicted of and sentenced for trafficking 1 gram of cocaine.  Eckhart was convicted and sentenced on February 4, 1991, one day before he was to testify for the prosecution at a pre-trial hearing in Pennsylvania in this case.  Detective Capitano of the Luzerne County District Attorney's Office was present at Eckhart's conviction and sentencing.

The brothers found the cooperation agreement pivotal for two reasons.  First, the prosecution failed to disclose the agreement (whatever the agreement may have been) or the letters to the defense, even though one of the letters pre-dates the trial.  Second, at trial, the judge did not allow the defense to cross-examine Eckhart for impeachment purposes because he had already been subject to similar questioning at the September 23 hearing.  At that hearing, Eckhart was asked whether he had a cooperative agreement with the prosecution, to which he responded, "No, none at all." See supra pp. 4–7.  In addition, Assistant District Attorney Marsilio, the author of the first letter, failed to disclose the agreement at the hearing when Eckhart denied that any such agreement existed.[7]  This information provided the base for the brothers' PCRA petitions.

In December, 1996, and January, 1997, the brothers filed PCRA petitions with the Luzerne County Court.  See Commonwealth v. Powell, 787 A.2d 1017, 1018 (Pa. Super. Ct. 2001).  The brothers alleged violations of the prosecution's disclosure requirements under Brady

---

[7]According to the Pennsylvania Rules of Professional Responsibility, an attorney has the duty to correct a witness's known perjury even if the falsity is discovered after the fact.  See Pa. R. Prof'l Conduct 3.3(a)(3).

and <u>Giglio</u>, the Confrontation Clause, and ineffective assistance of counsel.  Judge Cappellini appointed counsel for the brothers.  A hearing was held on October 1, 1997, but was continued so that counsel could procure additional transcripts.  <u>See</u> 787 A.2d at 1018.  Additionally, hearings were scheduled for July 16, and August 19, 1997, but were continued.  On September 9, 1998, the PCRA hearing occurred.  Through a series of subsequent events concerning the drafting of the PCRA petitions, the brothers came to proceed pro se and filed amended petitions in October, 1998.  <u>See</u> 787 A.2d at 1019.

On March 16, 2000, Judge Cappellini denied the PCRA petitions.  <u>See Commonwealth v. Powell</u>, Nos. 1990-904/5 (Luzerne Cty. Ct. Mar. 16, 2000) (order dismissing amended PCRA petitions).  He later issued an order dated September 1, 2000, to clarify that his March 16, 2000 Order denied both the original and the amended petitions.  <u>See Commonwealth v. Powell</u>, Nos. 1990-904/5 (Luzerne Cty. Ct. Sept. 1, 2000) (order dismissing original and amended PCRA petitions).

On March 29, 2000, the brothers appealed Judge Cappellini's March 16, 2000 Order to the Superior Court.  During the pendency of the appeal, but prior to the Superior Court's decision, Judge Cappellini issued an opinion, on October 18, 2000, regarding the brothers' PCRA petitions; we presume that the purpose of this opinion is to comply with Pennsylvania Rule of Appellate Procedure 1925(a).[8]  According to the opinion, on September 18, 2000, Judge

---

[8]Pennsylvania Rule of Appellate Procedure 1925 provides, in pertinent part:

(a) General rule.  Upon receipt of the notice of appeal, the judge who entered the order giving rise to the notice of appeal, if the reasons for the order do not already appear of record, shall forthwith file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, or shall specify in writing the place in the record where such reasons may be found.

If the case appealed involves a ruling issued by a judge who was not the judge entering the order giving rise to the notice of appeal, the judge entering the order giving rise to the notice of appeal may request that the judge who made the earlier ruling provide an opinion to be filed in accordance with the standards above to explain the reasons for that ruling.

(b) Direction to file statement of errors complained of on appeal; instructions to the appellant and the trial court.  If the judge entering the order giving rise to the notice of appeal ("judge") desires clarification of the errors complained of on appeal, the judge may enter an order directing the

Cappellini had ordered the brothers to file statements of matters complained of pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).

The Superior Court did not reach the merits of the PCRA appeal because it remanded the case back to County Court.  See 787 A.2d at 1021.  According to the Superior Court, although PCRA petitioners have a right to proceed pro se if they so choose, the brothers had not voluntarily waived their right to counsel.  See 787 A.2d at 1020.

After the remand, Judge Cappellini again considered the PCRA petitions.  He appointed counsel for the brothers, and held another PCRA hearing on July 17, 2002.  By opinion, on August 26, 2002, Judge Cappellini addressed the claims of ineffective assistance of counsel and denied the petitions.  See Commonwealth v. Powell, Nos. 1990-904/5 (Luzerne Cty. Ct. Aug. 26, 2002).  The brothers then requested to proceed pro se.  Pursuant to the will of the brothers, Judge Cappellini allowed counsel to withdraw, on September 12, 2002.

The brothers appealed pro se the denial of their petitions to the Superior Court on September 30, 2002.  In the opinion of October 29, 2003, the Superior Court addressed, inter alia, whether the prosecution's failure to disclose the alleged favorable treatment agreement with Eckhart materially impacted the brothers' trial strategy and whether the defense counsel assisted the defendants effectively, but denied relief as to all claims on appeal.  See Commonwealth v. Powell, No. 1581 MDA 2002 (Pa. Super. Ct. Oct. 29, 2003).  The Superior Court found "that Eckhart did ask the Commonwealth to inform the relevant Florida authorities of his cooperation in the present matter, so that he would be eligible for the gain time he could have received if he had remained incarcerated at Hendry prison" and "that the Commonwealth complied with [Eckhart's] request, as evidenced by the June 5th letter."  The Superior Court also found that a Brady violation did not occur because the gain time agreement was not an "actual agreement" for favorable treatment or leniency:

---

appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal ("Statement").

> [T]he Commonwealth's acquiescence to Eckhart's request is not indicative of an actual agreement granting Eckhart leniency or favorable treatment in exchange for testimony. As Attorneys Marsilio and Hughes explained, they simply had no authority to obtain favorable treatment or leniency from Hendry prison or the Florida authorities. The June 5th letter indicates Eckhart understood that no promises had been made, and any consideration offered by Florida was solely within Florida's discretion.
>
> The lack of an agreement is further evidenced by the fact that Eckhart received no discernable advantage from testifying against Paul and Robert. Eckhart lost 16 days of gain time for each of the four months he spent in Luzerne County, for a total loss of 64 days.

Eckhart decided to testify despite this considerable loss of gain time because of his desire to see his friend's killers brought to justice, not because he stood to benefit from any agreement with the Commonwealth. Moreover, Hendry prison policy, as explained by Mr. Luttman, does not reward prisoners for their testimony in other jurisdictions, it only compensates them for their good behavior while on transfer. Based on this evidence, the Commonwealth neither offered, nor did Eckhart receive, "favorable treatment" or leniency in exchange for his testimony against Paul and Robert. Accordingly, the June 5th letter was not material to Paul's and Robert's guilt, and the Commonwealth did not commit a Brady violation when it did not provide it to Paul and Robert before or during trial.

The Superior Court also analyzed the brothers' ineffective assistance of counsel claim under state law, which effectively mirrors the Strickland v. Washington, 466 U.S. 668 (1984), test. The brothers requested reargument with the Superior Court, which the Superior Court denied on January 1, 2004.

On February 2, 2004, the brothers petitioned the Supreme Court for allowance of appeal from the Superior Court's order of October 29, 2003. In their petition for allowance of appeal, the brothers contend that their Sixth Amendment confrontation clause rights were violated because the prosecution did not disclose the cooperation agreement with Eckhart, which prevented them from confronting Eckhart at trial on this issue. This issue had been raised in the brothers' PCRA petitions, but was not directly considered by the Luzerne or Superior Courts. The Supreme Court denied the brothers' petitions on January 4, 2005.

The brothers have failed to obtain relief from post-trial motions, direct appeals, and PCRA petitions.

III.     **Habeas Relief**

16

Petitioners filed their petitions for writs of habeas corpus under 28 U.S.C. § 2254 on

March 31, 2005.  The grounds for relief as alleged in the petitions are as follows:

> 1.      Petitioners were "denied [their] right to Due Process when the Commonwealth violated the mandates of <u>Brady v. Maryland</u>," because the prosecutor failed to disclose a pre-trial cooperation agreement with Charles Eckhart and related information.

> 2.      Petitioners were "denied the right to confront and effectively cross-examine a Commonwealth eye-witness during the Petitioner[s'] trial in violation of the Sixth Amendment," because the trial judge refused to allow the defense to confront and effectively cross-examine Charles Eckhart  regarding the alleged cooperation agreement with the prosecution.

3.      Petitioners were "denied [their] Sixth Amendment right to effective assistance of counsel for failing to impeach the Commonwealth's only two witnesses," because trial counsel failed to impeach with prior inconsistent statements the Commonwealth witnesses whose testimony was allegedly tailored to fit the prosecution's theory.

> 4.      Petitioner Paul Powell was convicted wrongly because "[t]he evidence at trial was insufficient," because the Commonwealth failed to prove beyond a reasonable doubt that Paul Powell was an accomplice or conspirator to first-degree murder.

We note that the brothers have exhausted these claims on either direct or collateral appeal.[9]

The Magistrate Judge held on March 29, 2007 an evidentiary hearing pursuant to Rule 8

of the Rules Governing § 2254 Cases to develop the record regarding the cooperation agreement

because "the Superior Court of Pennsylvania, in considering the contention of the Powell

brothers that the material non-disclosure was of an agreement between Luzerne County

prosecutors and Charles Eckhart, had seemingly addressed instead the issue whether there was an

agreement between Charles Eckhart and Florida correctional authorities," and "the Superior

Court of Pennsylvania, in finding that Charles Eckhart had no incentive to try to obtain

---

[9] Habeas corpus relief cannot be granted unless all available state remedies have been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the petitioner.  <u>See</u> 28 U.S.C. § 2254(b)(1). To exhaust available state court remedies, a petitioner must fairly present his claim through one complete round of the state's established review process in order to give the state courts one full opportunity to resolve any constitutional issues.  <u>See</u> <u>Nara v. Frank</u>, 488 F.3d 187, 197 (3d Cir. 2004).

Pennsylvania prosecutors' assistance in obtaining gain time benefits for Charles Eckhart by contacting Florida correctional authorities, had emphasized that Charles Eckhart lost gain time by coming to Pennsylvania to testify thereby disrupting his continuous confinement in Florida." Report and Recommendation, <u>Powell v. Wynder</u>, Nos. 05-647/8, slip op. at 9 (M.D. Pa. Jun. 18, 2007) [hereinafter R&R].

### A.   Hearing Testimony

Paul Powell, Luzerne County detective Richard Capitano, former District Attorney Thomas Marsilio, and Frank Nocitio, Paul Powell's trial attorney testified as witnesses.  The testimony produced is detailed in the Magistrate Judge's Report and Recommendation, issued on June 18, 2007.  To be comprehensive, we will reproduce it here:

> Paul Powell stated that he had not had the Marsilio letter or the Capitano letter when Charles Eckhart had testified in a pretrial conference before Judge Cappellini and had denied that there was any cooperative agreement between him and the Luzerne County District Attorney's Office and had denied that there was any contact between Luzerne County officials and Florida officials on behalf of Charles Eckhart.

> Paul Powell testified that during the murder trial no witness other than Charles Eckhart identified Robert Powell as the shooter of Roy Myran.

> Paul acknowledged in cross examination that Robert Powell had admitted to shooting Roy Myran in the course of the murder trial and that the defense of both defendants was based upon a contention of a high level of intoxication of the Powell brothers.

> Detective Capitano testified that he had been a Luzerne County detective in 1990 and 1991 and is presently a Luzerne County detective.  He became involved in the investigation of Roy Myran's death on the night that Roy Myran was killed in February of 1990.  He became the lead detective in that case.  After the Powell brothers were convicted, Detective Capitano sent letters to W.R. Luttman at the Hendry Correctional Institution, and to Judge Frenza, in Florida.  In the letter to W.R. Luttman, it was stated that Charles Eckhart was an eyewitness in a homicide trial and that it can not [s.i.c.] be stressed enough how important Charles Eckhart was.  Mr. Eckhart, Detective Capitano had written, was a key witness.  Without Mr. Eckhart, Detective Capitano had written, the prosecution would have lost the homicide trial.

18

Detective Capitano stated that his view that Charles Eckhart was a pivotal witness had changed since he had written that letter, however, Detective Capitano acknowledged also authoring the letter dated August 10, 1992 to Judge Frenza, in which Charles Eckhart was described as the prosecution's "sole eyewitness" and as a "crucial element" in the prosecution of Robert and Paul Powell. He acknowledged that the Powell brothers had been previously arrested on the night of the Myran killing and charged with drunken disorderly conduct. He stated that it was incorrect that Charles Eckhart had been the sole eyewitness. He stated that Ken Kuras had been an eyewitness. He stated that he did not remember whether Charles Eckhart had testified, in addition to his eyewitness testimony that Robert Powell had shot Roy Myran, that the Powell brothers were not intoxicated.

Detective Capitano acknowledged that he had gone to Florida to pick up Charles Eckhart to bring him to Pennsylvania, but had not brought back Charles Eckhart with him to Pennsylvania at that time. Charles Eckhart at some point acquainted Detective Capitano with his gain time issues with Florida. He stated that Charles Eckhart had not ever asked him to help him out with his Florida gain time issues. He stated that Mr. Luttman in Florida had asked him to write the letter to Mr. Luttman. He had conversations with Mr. Marsilio about that fact that Charles Eckhart had cooperated.

Detective Capitano explained that under Florida correctional law and practices, a prisoner earns twenty days of gain time for every thirty days served. Charles Eckhart had not earned gain time while he was in Pennsylvania.

Detective Capitano stated that his view of the importance of Charles Eckhart's testimony had changed because it had dawned on him that the Powell brothers had admitted to killing Roy Myran and because their defense had been diminished capacity. He stated that there were no agreements with Charles Eckhart.

Thomas Marsilio stated in his testimony that he had been an Assistant District Attorney in 1990 when he became involved in the Roy Myran murder case. He was the attorney for the Commonwealth at the Powell brothers' preliminary hearing, he was the attorney for the Commonwealth at the pretrial hearing of September 23, 1991, and he was the trial attorney for the Commonwealth. He was present for Charles Eckhart's testimony at all three proceedings. His June 5, 1991 letter to the Warden of the Hendry Correctional Institution implies a prior conversation with the Warden, but Mr. Marsilio does not recall a prior conversation with the Warden. He remembers that he had made a telephone call to Florida prior to writing his letter, but does not recall who it was to whom he spoke and he does not remember the substance of the conversation. He might have been asked by Charles Eckhart at some time prior to June 5, 1991 to communicate

19

to Florida about Charles Eckhart's cooperation, and he might have advised Charles Eckhart that he would inform Florida authorities about his cooperation. He felt it to have been true, in any event, that Charles Eckhart had been advised by the prosecution that his cooperation would be communicated to Florida authorities. He did intend, in sending the letter to inform Florida authorities and to have the Florida authorities inform Charles Eckhart that the prosecution had upheld its agreement with Charles Eckhart, to communicate to Florida authorities that Charles Eckhart had cooperated in the murder prosecutions.

He did not turn (a copy of) his letter over to the defendants' (Powells') attorneys, Messrs. Saporito and Nocito. He was present at the Powell brothers' pretrial proceeding when Charles Eckhart testified that no contact(s) had been made by Pennsylvania authorities to Florida authorities on behalf of Charles Eckhart. He did not think of this letter when he heard that testimony from Charles Eckhart. He did not think of it after trial, either, or at any point before the 2002 hearing before Judge Cappellini. He acknowledges that it is a letter that should have been turned over to the defense. He also acknowledges that he was in 1991 referring in the public area in the context of his campaign to become the elected District Attorney of Luzerne County to have "had a total of five life sentences" including the Powell brothers. He does not recall asking Judge Cappellini by way of an in limine motion to restrict cross examination of Charles Eckhart about possible cooperation in exchange for prosecutions' assistance with Florida authorities, but recalls that "we wanted to prevent his Florida conviction from being brought out in trial . . . ." He does not remember seeking to exclude testimony that Charles Eckhart may have expected to receive consideration in Florida for his cooperation in Pennsylvania.

Upon questioning by Assistant District Attorney Barletta, Mr. Marsilio stated that the purpose of the letter he sent to the Warden at the Hendry Correctional Institution was to express Mr. Marsilio's opinion that Charles Eckhart should receive Florida gain time because he was cooperating. The reference to "agreement" was an agreement with Charles Eckhart to contact Florida authorities about gain time. There was no other agreement.

However, he acknowledged, nothing referring to gain time appeared in the June 5, 1991 letter.

Frank Nocito was Robert Powell's trial attorney and continued to represent him through the PCRA proceedings. He stated in his testimony that he had first seen the June 15, 1991 Marsilio letter at a 2002 PCRA hearing. If he had been provided with that letter before or during the trial, he would have used it in cross examining Charles Eckhart. He acknowledged that the principal trial defense was based upon the defendants' intoxication and that Robert Powell had admitted that he had shot Roy Myran.

20

R&R at 10–18.

**B.      Findings of the Magistrate Judge**

Prior to reviewing the evidence in light of the brothers' habeas petitions, the Magistrate Judge determined that the evidence considered ought not include trial testimony from the brothers.  Perhaps the chief complaint of the brothers is that their trial strategy, including testifying on the stand in their own defense, would have differed had they been able to impeach Eckhart.  The Magistrate Judge concluded that, "the court should not consider their trial testimony in determining what would have happened if Charles Eckhart had been impeached by the fact of the prosecutors' agreement to help him out by asking Florida correctional authorities to hold the loss of Florida gain time to a minimum."

First, the Magistrate Judge found that the defendants' rights to due process under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), were not violated when the prosecution failed to disclose the good time credit agreement between the prosecution and Eckhart.  The Magistrate Judge found that a cooperation agreement did exist between the prosecution and Eckhart, and that it should have been disclosed to the defense.  According to the Magistrate Judge, Charles Eckhart's PCRA testimony that the Luzerne County prosecutors did nothing to help him in Florida was "so blatantly inconsistent with what occurred here that it implies a consciousness of its falsity."  Had the fact-finder known of the cooperation agreement, the fact-finder may have perceived the benefit which flowed to Eckhart from the agreement "as something that could have forged an inroad into the reliability of Charles Eckhart's memory that Robert Powell was the shooter and that the Powell brothers were not intoxicated."  The Magistrate Judge found that the defense's decisions to forgo a jury trial and to testify in one's defense may have been altered had the defense had the benefit of the letters which memorialized the cooperation agreement.  Under Giglio, however, the Magistrate Judge also found that the defendants' inability to impeach Eckhart's credibility regarding the agreement would not have reasonably affected the judgment of the fact-finder because other facts clearly

21

and easily established guilt.  The petitioners failed to establish by a preponderance of evidence that they would have defended the cases differently if they had exculpatory evidence.  <u>See</u> R&R at 19–28.

Second, the Magistrate Judge found that the defendants' right of confrontation under the Sixth Amendment was not violated when the trial judge refused to permit cross-examination of Eckhart regarding help that Eckhart had received from the prosecution.  The Magistrate Judge found that although the proper procedure would have been for the entire pre-trial hearing to be on record and for a full cross-examination of Eckhart at trial, the defendants had the opportunity to confront Eckhart in the eyes of the fact-finder.  <u>See</u> R&R at 29–30.

Finally, the Magistrate Judge found that the defendants' right of effective assistance of counsel under the Sixth Amendment was not violated when defendants' trial counsel failed to impeach two eye-witnesses with prior inconsistent statements.  The Magistrate Judge found that no reasonable probability existed that the result of the trial would have been different but for trial counsel's errors because other evidence provided a basis to find the defendants guilty of first-degree murder beyond a reasonable doubt.  <u>See</u> R&R at 30–32.

The Magistrate Judge did not mention, address, or decide Paul Powell's sufficiency of the evidence claim.

C.     **Objections**

Each brother filed objections to the Magistrate Judge's Report and Recommendation, however the objections are not identical.

Paul makes three objections.  First, Paul argues that "the Honorable Magistrate Judge erroneously depended upon defense testimony, including Robert and Paul Powell's trial testimony, in coming to a conclusion that the fact-finder would have found the Powell brothers guilty of first degree murder in any instance."  Second, Paul argues that "the Honorable Magistrate Judge erroneously found . . . that Ken Kuras [and many other witnesses] established that Robert and Paul were outside of Jones' Bar when Kuras, Roy Myran, Charles Eckhart and

Mark Hannigan departed from Jones' Bar at approximately 10:30 p.m. on February 5, 1990."
Finally, Paul argues that "the judge could not have weighed Eckhart's critical testimony fairly
and justly and, furthermore, the facts did not clearly establish, as the Honorable Magistrate Judge
found, Eckhart's consideration was limited to gain time."

Robert also makes three objections to the Magistrate Judge's Report and
Recommendation.  First, Robert argues that "the Magistrate Judge erred in concluding that the
impeachment evidence would not have" significantly impacted the outcome of the trial.  Next, he
argues that "[t]he Magistrate Judge also suggests that there was abundant other evidence of
Robert and Paul's involvement in the homicide, aside from testimony of Mr. Eckhart," but "there
was no testimony, aside from the eye-witness testimony of Mr. Eckhart, linking either of the
Powells to the homicide."  Third, Robert argues that "had the defense been informed of Mr.
Eckhart's false testimony in court, they may well have adopted a different trial strategy," which
could have produced a different outcome at trial.

DISCUSSION

I.     **Standard of Review**

When objections are filed to a report and recommendation of a magistrate judge, we
review de novo the portions of the report to which objections are made.  28 U.S.C. §
636(b)(1)(C); see Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989).  We may accept,
reject, or modify, in whole or in part, the findings or recommendations made by the magistrate
judge.  28 U.S.C. § 636(b)(1); M.D. Pa. Local R. 72.3.  Although our review is de novo, we are
permitted to rely upon the magistrate judge's proposed recommendations to the extent that we, in
the exercise of sound discretion, deem proper.  See United States v. Raddatz, 447 U.S. 667, 676
(1980); see also Goney v. Clark, 749 F.2d 5, 7 (3d Cir. 1984).

In the interest of justice, we have reviewed de novo the entire Report and
Recommendation of the Magistrate Judge.  Although we agree with the Magistrate Judge's

23

conclusions, we will analyze each habeas claim anew to ensure that the scope of § 2254(d) is applied. We will address implicitly the objections in our discussion.

## II.    Merits Analysis

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a prisoner to challenge the fact or duration of his confinement because the petitioner is in custody in violation of the Constitution or the laws of the United States. See 28 U.S.C. § 2254(a); Preiser v. Rodriguez, 411 U.S. 475, 498–99 (1973). The federal habeas court has a limited role to play in the review of a prisoner's claims: "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991).

The standard we use to review a petitioner's habeas claims under § 2254 depends on whether those claims have been adjudicated on the merits by the state court. If the state court adjudicated the claim on the merits, then § 2254(d) limits our review of the state court's decision as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). All of the claims have been adjudicated on the merits by state court, except the Confrontation Clause claim.

We use a three-step process to determine whether the state court decision was "contrary to" or "an unreasonable application of" federal law under § 2254(d)(1). See Outten v. Kearney, 464 F.3d 401, 413 (3d Cir. 2006). First, we identify the "clearly established Federal law, as

determined by the Supreme Court of the United States," that applies to the petitioners' claims. Williams v. Taylor, 529 U.S. 362, 389–91 (2000); Outten, 464 F.3d at 414.  Only the holdings—not dicta—are relevant for us to consider.  See Outten, 464 F.3d at 412.  Next, we consider whether the state court applied a rule that contradicts the applicable, relevant federal law or whether the state court confronted facts that are materially indistinguishable from a Supreme Court decision, but decided the case "substantially different" from the Supreme Court decision on point.  See Williams, 529 U.S. at 405–06.  The petitioners must show that Supreme Court precedent requires the contrary outcome.  See Outten, 464 F.3d at 413.  Finally, if the state court decision is not "contrary to" Supreme Court precedent, then we consider whether the state court applied unreasonably the Supreme Court precedent.  See Outten, 464 F.3d at 413–14.  A state court applies unreasonably Supreme Court precedent when it articulates the holding of the Supreme Court case but applies the holding unreasonably to the facts of the state court case.  See Williams, 529 U.S. at 407–08, 410.  We must not substitute our judgment for that of the state court; the standard is whether the state court application of federal law is objectively unreasonable.  See Williams, 529 U.S. at 409–10.

Pursuant to § 2254(d)(2), we consider objectively the state court's decision to determine whether it was unreasonable given the totality of evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d)(2); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing Williams, 529 U.S. at 399).  A determination is unreasonable if a rational jurist could not reach the same finding on the basis of the evidence in the record.  See 28 U.S.C. § 2254(d)(2).

If the petitioner objects to the state court's finding as to a certain fact or facts, we presume that the state court's findings are correct unless the petitioner can rebut this presumption with clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  This presumption applies to both explicit and implicit findings of fact.  See Campbell v. Vaughn, 209 F.3d 280, 286 (3d Cir. 2000).

As for the previously unadjudicated Confrontation Clause claim, we review de novo both legal questions and mixed factual and legal questions, and presume factual findings to be correct unless the petitioner can rebut this presumption with clear and convincing evidence.  See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

We regret that Robert and Paul Powell did not receive notice of the alleged cooperation agreement between Eckhart and the prosecution, that the brothers were then not able to use the cooperation agreement to impeach Eckhart's credibility, that the prosecution did not correct Eckhart's perjury as the prosecution should have under the Pennsylvania Rules of Professional Conduct, and that the brothers could not use Eckhart's perjury to further impeach Eckhart's credibility.  Had the brothers—and their counsel—known of these issues regarding Eckhart, they may have elected a different trial strategy.  We empathize with the frustration that the brothers must feel, because we too are frustrated with the prosecution's actions, however "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."  Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).

Despite the imperfect performance of the criminal justice system in the case of the Powells, though, we have reviewed all of the evidence, transcripts, petitions, briefs, and prior opinions in this case, and we remain confident that the Powells received due process and were found guilty of the murder of Roy Myran beyond a reasonable doubt.  We will now address each claim.

### A.    **Brady** and **Giglio** Claim

The petitioners' argue that (1) an agreement existed between the prosecution and Charles Eckhart, (2) this agreement is favorable, impeachment material, (3) thus, this agreement was subject to disclosure by the prosecution under Brady v. Maryland, 373 U.S. 264 (1963), and

Giglio v. United States, 405 U.S. 150 (1972), and (4) the failure of the prosecution to disclose the agreement undermines the confidence of the outcome of the trial.

Various Supreme Court cases provide precedent for this claim, the foremost being both Brady v. Maryland and Giglio v. United States. "Deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" Giglio, 405 U.S. at 153 (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935). "'The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" Id. (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." Brady, 373 U.S. at 87. The elements of a Brady prosecutorial misconduct claim may be thought of as three: (1) the evidence must be favorable to the accused; (2) the prosecution must have suppressed the evidence ("cause"); and (3) the evidence must be material ("prejudice"). See Banks v. Dretke, 540 U.S. 668, 691 (2004).

Favorable evidence that the prosecution must disclose includes exculpatory evidence as well as impeachment evidence. See United States v. Bagley, 473 U.S. 667, 676 (1985) (citing Giglio, 405 U.S. at 154). Favorable evidence includes express cooperation agreements or other promises made by the prosecution to its witness, because such arrangements may affect the credibility of the witness or reveal bias or interest of the witness. See Giglio, 405 U.S. at 154–55; see also Bagley, 473 U.S. at 684 (extending Giglio to include informal promises or inducements by the prosecution) ("This possibility of a reward gave [the witnesses] a direct, personal stake in respondent's conviction. The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction.").

In Bagley, the Supreme Court extended the Brady disclosure requirement from cases in which the defense generally requested such information to also include cases in which the

defense did not request such information; a specific request need not be made to invoke the Constitution's protection of due process. See id. at 682. The Brady "rule encompasses evidence 'known only to police investigators and not to the prosecutor.'" Strickler v. Greene, 527 U.S. 263, 281 (1999) (quoting Kyles v. Whitley, 514 U.S. 419, 438 (1995)). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles, 514 U.S. at 437. "When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." Banks, 540 U.S. at 675–76.

Finally, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682. A showing of materiality does not require a defendant to demonstrate by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal, nor does it require a defendant to demonstrate that after discounting the inculpatory evidence in light of the disclosed evidence there would not have been enough evidence left to convict. Kyles, 514 U.S. at 434–35. The defendant must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435.

To the extent that the Superior Court found that the good-time agreement was not an agreement or favorable to the accused because in the letter agreement, the accused "understood no promises have been made," it still applied unreasonably Supreme Court precedent. Bagley and Giglio make clear that evidence that can be used for impeachment is favorable to a defendant. In this case, due to the agreement between the prosecution and Eckhart, Eckhart received some good time credit to which he would not otherwise be entitled. The Superior Court

unreasonably focused on Eckhart's ultimate net loss of gain time because of his presence in Pennsylvania.  Although Eckhart did lose gain time because he was not present at the Hendry facility, he would have also lost good behavior credits but for the prosecution's letter to the Hendry warden.  The agreement inures to Eckhart's benefit, and could be used to impeach him for (1) bias and ulterior motive, and (2) truthfulness, because Eckhart lied about the agreement under oath.  The agreement need not be official or formal.  The letter, however, written prior to the commencement of trial, memorializes the agreement between the prosecution and Eckhart.  Even Assistant District Attorney Marsilio admitted at the habeas evidentiary hearing that he ought to have disclosed the letter to the defense:

> Q.      And you were specifically present when Mr. Eckhart denied that any contact at all had been made by Pennsylvania authorities on his behalf to the Florida authorities.  Is that right?
>
> A.      I was present when he testified.  With you this morning I did review three questions and three answers that generally stated when you've represented from the trial transcript.
>
> Q.      Do you have any specific recollection of thinking about this letter or the fact that it needs to be turned over to counsel while Mr. Eckhart was testifying in your presence in front of Judge Cappellini?
>
> A.      No, sir.
>
> Q.      Did it strike you, after the trial, that that's a letter that should have been turned over to the defense?
>
> A.      No, it asn't.  As a matter of fact, it didn't come to my attention or the issue didn't come to my attention until 2002, when we had the hearing before Judge Cappellini.
>
> Q.      In your position as assistant DA and prosecutor of the Powell brothers specifically . . . do you think that's a letter that should have been turned over to the attorneys for the defense?
>
> A.      I would have to say yes.

Habeas Hr'g Tr. 55:12–56:10.  That Marsilio forgot about the agreement is no excuse for its suppression.

Although the prosecution should have disclosed the good time agreement, the suppression is not grounds to reverse the convictions because it does not undermine confidence in the outcome of the trial.  To rise to constitutional error, the <u>Brady</u> evidence must be material.  Had the brothers had the benefit of the impeachment evidence, the whole trial would not have been in such a different light as to undermine the confidence in the verdict, and therefore it is not material.  Although the agreement has some impeachment value, to the fact-finder, that impeachment value would be outweighed by the fact that Eckhart ultimately did lose good time by testifying.  That Eckhart did perjure himself by denying the agreement would not affect his credibility enough to undermine the confidence in the verdict.  Eckhart appeared otherwise credible.  The Superior Court's conclusion is objectively reasonable.

### B.    Confrontation Clause Claim

We may sum up the petitioners' argument regarding the Confrontation Clause as follows: the petitioners were denied their right to effectively confront key eye-witness Charles Eckhard when (1) the trial judge proscribed bias or credibility cross-examination at trial (2) because counsel have had a chance to do such cross-examination at the September 23 pre-trial hearing and (3) because the prosecution failed to disclose <u>Brady</u>/<u>Giglio</u> evidence; (4) however the opportunity for effective cross-examination at the pre-trial hearing was frustrated because (5) Charles Eckhart perjured himself when he testified that no agreement existed with the prosecution regarding his cooperation; and (6) the seriousness of the perjury is compounded by the prosecution's failure to correct the perjury.  That the fact-finder—the trial judge—was present at the pre-trial hearing further complicates this argument; most cases tend to concern the jury's ability to weigh the credibility of the witness.  This case is slightly different than most cases because the fact-finder was present for the earlier cross-examination.

The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witness against him."  U.S. Const. amend. VI.  The import of the Confrontation Clause is to allow an accused to cross-examine his accuser.  <u>See</u> <u>Davis v.</u>

Alaska, 415 U.S. 308, 315–16 (1974) (quoting, in part, 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)).  The right to confront applies to defendants in state criminal proceedings.  See Pointer v. Texas, 380 U.S. 400, 406 (1965).  The realm of the Confrontation Clause protects an accused's right to attack the credibility of a prosecution's witness to reveal possible bias, prejudice, or ulterior motives.  See Davis, 415 U.S. at 316.  A violation of the Confrontation Clause is constitutional error of the first magnitude regardless of prejudice.  See Brookhart v. Janis, 384 U.S. 1, 3 (1968).  "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).

The Supreme Court case of Davis v. Alaska, 415 U.S. 308 (1974), governs the brothers' situation:  when the trial judge limits a defendant's cross-examination.  In Davis, the trial court proscribed the defense from questioning a prosecution witness about his juvenile record, for which he was still on probation.  Id. at 310–12.  The defense wanted to introduce evidence by cross-examination that, because he was still on probation, the witness may be biased or prejudiced in favor of testifying for the prosecution.  Id. at 311.  The defense did not want to introduce the witness's record to impeach generally the witness's character.  Id.  The Court held that a violation of the Confrontation Clause did occur, and that the Alaska Supreme Court's decision to limit the cross-examination of the prosecution witness to uphold the state's policy of keeping juvenile records protected was untenable.  Id. at 319–20.

A trial judge may only limit the cross-examination of an accuser, for the purposes of the Confrontation Clause, in cases where the questioning is (1) designed only to harass, annoy, or humiliate the witness, (2) repetitive or marginally relevant, (3) confusing on the issues or unfairly prejudicial, or (4) where the witness properly invokes his right against self-incrimination.  See Delaware v. Van Artsdall, 475 U.S. 673, 679 (1986); Davis, 415 U.S. at 320; Alford v. United States, 282 U.S. 687, 694 (1931); cf. Fed. R. Evid. 403.

31

In the instant case, the pre-trial examination of Eckhart relating to his incarceration occurred in camera, and according to the September 23 pre-trial hearing transcript, some of it occurred off the record.  This segment of testimony was incorporated into the trial transcript in lieu of allowing defense counsel to cross-examine Eckhart on his incarceration and good time credits.  According to the trial transcript, Judge Cappellini decided to preclude further cross-examination testimony: "Rather than having this [cross-examination] brought out in open court, which will serve no purpose, particularly since there's no jury, and; secondly, since I am already aware of it, we are putting it on the record now that counsel for the Defendant [will not] be permitted to examine this witness on the basis that I have just discussed on the record."  N.T. 485:1–:7.  Judge Capellini did not cite any of the factors listed by the Supreme Court for his decision to grant the motion in limine.  At best, his decision rested on the cross-examination being repetitive, however cross-examination designed to impeach an eye-witness in a murder trial is not repetitive when the prior testimony was in a pre-trial hearing held to determine another issue.  Surely the scope of the cross-examination at the pre-trial hearing was less than it would have been at the murder trial.  Although the defendants may have had an opportunity for effective cross-examination for purposes of the motion to suppress at the pre-trial hearing, they did not have an opportunity for effective cross-examination at trial, when the ultimate outcome was at stake.  Accordingly, we find that Robert and Paul's right to effectively confront their accuser, Charles Eckhart, was violated; however our inquiry does not end here.

In Delaware v. Van Arsdall, 475 U.S. 673 (1986), the Supreme Court made explicit that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject" to the Chapman v. California, 386 U.S. 18 (1967) harmless error standard.  Van Arsdall, 475 U.S. at 684.  Therefore, we must evaluate whether the violation of the Confrontation Clause right, did not, beyond a reasonable doubt, contribute to the verdict obtained.  See Chapman, 386 U.S. at 24.  We may consider, among others, the following factors: the importance of the witness's testimony, whether the testimony

32

was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case.  See Van Arsdall, 475 U.S. at 684.

      1.     Importance and Cumulation of Eckhart's Testimony

Charles Eckhart's testimony established the following: (1) Eckhart saw Robert and Paul at Jones' Bar between 7:30 and 8:05; (2) Robert did not appear to be intoxicated; (3) Robert and Paul were not present at Jones' Bar when Eckhart returned at 8:30; (4) Eckhart left Jones' Bar at 10:30 with Ken Kuras, Roy Myran, and Mark Hannigan; (5) Outside the bar, they saw Paul moving outside the bar, and then standing up against a wall; (6) Eckhart saw a flash of light and heard an explosion, coming from under the stairs; (7) Eckhart then saw Robert step out from under the dark area under the stairs into the light with a rifle; (8) Eckhart heard, but did not see, another shot; and (9) Eckhart saw both brothers climb a fence with the rifle, then run into a backyard, and then down Oregon Street.  See N.T. 461:12–512:8.

As the Powells' point out in their objections to the Report and Recommendation, Eckhart was the only witness at trial to identify Robert Powell as the shooter, with the rifle.  Eckhart was the only witness to suggest that the gunshots came from under the stairs, thus supporting a premeditated, lying-in-wait theory:

> Q.      Did you observe anything?
> A.      I observed a flash of light from under the stairs and heard a loud explosion.
>               . . .
> Q.      What happened after that?
> A.      Then Robert Powell stepped out from under this dark area . . . under here.
>               . . .
> A.      Robert Powell came out from under the step area here and stood about right here.
>               . . .
> Q.      Did you get a good look at him?
> A.      Yes, I was looking at his face.
> Q.      Did he have anything in his possession?
> A.      A rifle.

N.T. 472:18–474:21.  Additionally, Eckhart was the only witness to identify the Powells as the persons who fled the scene.  Mark Hannigan, one of the four who left Jones' Bar at 10:30 p.m. did not testify at trial.  Ken Kuras, also one of the four, did testify, however his testimony only established that he saw Paul Powell outside the bar, and then heard gunshots and saw a flash of light from around the steps:

> Q.      When you reached this particular area what did you see, if anything?
>
> A.      Paul Powell was standing right here . . . with his hands, his back and his head . . . up against the wall.
>                                                . . .
> Q.      What occurred after that?
>
> A.      When I got to here . . . a gunshot went off.  It came from this direction over here . . . and Roy Myran went down right here.  He spun and his head hand [s.i.c.] landed in this area.
>                                                . . .
> Q.      What occurred after that?
>
> A.      I heard a noise from where the gun shot came from.  I started running this way.  When I got to the door I slipped, another gunshot went off and I felt the back of my hair rise.
>                                                . . .
> Q.      Now, the individual that you saw behind the shed as we have depicted it, who was that again?
>
> A.      Paul Powell.
>                                                . . .
> Q.      You heard a weapon discharge twice, is that correct?
>
> A.      Yes.
>
> Q.      Do you know who was firing that weapon?
>
> A.      No, sir.
>
> Q.      Did you see anyone firing the weapon?
>
> A.      No, sir.  I saw a flash from the first shot that went off from the left-hand side, made a loud noise.

34

N.T. 412:16–416:2.  Carol Arnold, another witness at trial, observed two individuals fleeing the scene with a weapon, after hearing gunshots, but she could not identify those individuals.  Thus, the only person to identify the shooter, the weapon, and the location of the shooting was Charles Eckhart.  His testimony provided important direct evidence in the Powells' trial.[10]  Because Eckhart was the only witness to present this testimony, it is not cumulative.

        2.        Corroborating or Contradictory Evidence

Eckhart identified Paul Powell as the man standing by Ken Kuras' truck in the parking lot outside the bar.  Ken Kuras also identified Paul as such.

Eckhart identified Robert Powell as the shooter because he saw him emerge with a gun from the area from where he heard the shots.  No other witness identified Robert as the shooter or identified him as holding a gun.

Eckhart heard and saw two shots come from under the stairs.[11]  No other witness could testify to these facts.  Kuras testified that he heard the shots "from this direction over here."  Because we do not have the benefit of seeing the indication that Kuras made to the replica of the parking lot, we cannot tell where he pointed, however we assume it was in the general vicinity of the stairs.  Kuras did not see the flashes of light come from the barrel of the rifle.  The prosecution argued that the spent casing found at the scene of the crime "is generally consistent with the evidence and with the ejection of rounds from a 30/30 Marlin from the steps area and from in front of the steps area."  Officer Andreoli testified that the spent casing was found on the gravel a couple of hours after the incident, but that it could have been kicked or moved by the group of paramedics and police attending to the scene.

---

[10]The letters sent to the authorities in Florida also indicated the importance of Eckhart's testimony.

[11]In Eckhart's written interview with the Wilkes-Barre Police, he did not identify the shots as fired from under the stairs.  Instead, he wrote "I was watching them walking when I saw a flash of light and Roy stiffen and fall.  I then saw a man (earlier he told me his name was Bob) step out of the shadows holding a rifle."  This interview was not entered into evidence at trial, however it is in the habeas record.

Eckhart saw and identified the brothers as the two persons who fled the scene of the crime with a rifle.  Only Carol Arnold could corroborate that two persons fled from outside the bar, and she could not identify the brothers as those two persons.

No documents or items were entered into evidence during Eckhart's testimony to corroborate or contradict his testimony.

### 3. Extent of Cross-Examination Otherwise Permitted

The trial court prohibited any cross-examination "concerning his [Eckhart's] conviction and whether there has been any favoritism shown to this particular witness by the authorities in Pennsylvania or whether in the future, depending on his testimony here, whether the authorities here would be inclined to write down to the institution in Florida in the event this particular witness needs any help with any problems he may have down in Florida."  N.T. 484:17–25.

The prosecution lodged two objections during the cross-examination, one of which it withdrew after the question was answered by Eckhart.  Judge Cappellini overruled the second objection.  Thus, the trial court did not limit the scope of the cross-examination further by sustaining an objection.

The cross-examination allowed at the September 23 pre-trial hearing concerned Eckhart's Florida conviction, the good time credit system in Florida, his prison housing in Pennsylvania, and his possible incapacity the night of February 5, 1990.  Judge Cappellini limited the cross-examination regarding Eckhart's possible drug use and possible drug possession.  This testimony occurred in camera, and some testimony or discussion appears to have occurred off the record.

### 4. Overall Strength of the Prosecution's Case

Although it is not our job to substitute our judgment for that of the state court on habeas review, we must consider objectively the strength of the prosecution's case to evaluate the Confrontation Clause violation.  We note that we consider the strength of the prosecution's case without the benefit of the exhibits used at trial, which provided the physical framework for the events of February 5, 1990.

The prosecution generally had strong circumstantial evidence to support a finding that the Powells were responsible for the killing of Roy Myran.  The Powells were involved in a fight at Jones' Bar earlier, Paul was identified in the parking lot, two suspects matching the brothers fled the scene, and pieces of their clothing were recovered on the fence that the fleeing suspects climbed.  The fleeing suspects also had a rifle.  Charles Eckhart identified Robert as the shooter with the rifle.

We believe reasonable minds could differ regarding the first-degree murder charges.  The brothers had been arrested just two hours prior for public intoxication, and various witnesses testified that the brothers had been drinking prior to the shooting.  Intoxication can mitigate first-degree murder.  See 18 Pa. Cons. Stat. Ann. § 308.  In addition, no witness saw Robert under the stairs; lying in wait is a necessary element for premeditated first-degree murder.  Charles Eckhart testified that he saw a flash of light from under the stairs and that Robert emerged from the stairs area.  Notably, no other witness saw where the gunshots came from or that Robert discharged the rifle.  Additionally, Eckhart's written witness interview, completed at the Wilkes-Barre Police Station after the shooting, does not mention stairs at all.  This written interview, however, was not entered into evidence or used to impeach Eckhart.

Despite our belief that reasonable minds could differ on the elements of first-degree murder, a rational fact-finder could have found that the brothers satisfied the elements necessary to sustain a charge of first-degree murder.

Given our evaluation of the above factors, we find that the Confrontation Clause violation was harmless.  At best, had the defense had an opportunity to cross-examine Eckhart, they would have established that an agreement existed between the prosecution and Eckhart, that the prosecution would report that Eckhart was acting appropriately in order for him to receive the benefit of the good behavior credits for the period he was in Pennsylvania,[12] that Eckhart lied

---

[12]The Powells contend that because the letters to Florida do not specify the "agreement" reached by the prosecution and the brothers, the agreement could have covered more than just good time credits.  We reject this argument.  The prosecution admitted at the habeas hearing that

under oath regarding the existence of this agreement, and that the prosecution failed to disclose the agreement or correct Eckhart's perjury regarding the existence of the agreement.  Although these facts, if established, undermine Eckhart's credibility, they would not undermine the ultimate verdict; therefore, the error is harmless.

###    C.    Ineffective Assistance of Counsel Claim

Both Powell brothers argue that their counsel were ineffective for many reasons at trial. The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel.  See Strickland v. Washington, 466 U.S. 668, 685–86 (1984).  A defendant who alleges ineffective assistance must satisfy the two-part test outlined in Strickland:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.  To show deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  Id. at 686–88.  We strongly presume that counsel's conduct falls within the wide range of reasonable assistance.  See id. at 689.  To demonstrate prejudice, the defendant must show that counsel's deficient performance "actually had an adverse effect on the defense." Id. at 693.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

The Pennsylvania courts directly considered this issue, and correctly used a test tantamount to the Strickland test to consider Robert and Paul's arguments.  We see no error

---

the agreement should have been disclosed, but that the agreement did not cover anything beyond good-time credits.  The Powells provide no evidence or facts to support that the agreement had another facet.

correctable in their analysis.  The Powells each received their Sixth Amendment right to effective assistance of counsel.

### D. Paul Powell's Sufficiency of the Evidence Claim

Paul Powell argues that:

> The Commonwealth failed to prove beyond a reasonable doubt that Petitioner was an accomplice or conspirator to first-degree murder. The Commonwealth's contention that the petitioner "lured" or "coaxed" individuals to the back of Jones' Bar where a shooting occurred was contrary to the evidence presented at trial.  The Commonwealth's own witnesses testified that Petitioner did not "lure" or "coax" them in any way and that they went to the back of the bar on their own volition.  Petitioner never possessed the requisite specific intent and was merely present at the scene when the crime occurred.

Paul Powell Pet. Habeas Corpus, doc. 1, No. 05-cv-647.

Jackson v. Virginia, 443 U.S. 307 (1979), governs the federal constitutional standard for evaluating a due process claim based upon the sufficiency of evidence.  According to Jackson, our job is to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.  We use state law to determine the elements of the particular crime for which we evaluate the sufficiency of the evidence.  Id. at 324 n.16.  The credibility of witnesses, the resolution of conflicts of evidence, and the drawing of reasonable inferences from proven facts are within the province of the fact-finder, and are beyond the scope of our habeas review.  See id. at 319.  The state courts used a standard effectively similar to the Jackson standard.

Pennsylvania statutes provide the elements for conspiracy and complicity.  Regarding conspiracy, 18 Pa. Cons. Stat. Ann. § 903 provides:

> (a) Definition of conspiracy.  A person is guilty of conspiracy with another person or persons to commit a crime if with the interest of promoting or facilitating its commission he:
> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

> (2) agrees to aid such other person or persons in the
> planning or commission of such crime or of an attempt or
> solicitation to commit such crimes.
> . . .
> (e) Overt act.  No person may be convicted of conspiracy to
> commit a crime unless an overt act in pursuant of such conspiracy
> is alleged and proved to have been done by him or by a person with
> whom he conspired.

18 Pa. Cons. Stat. Ann. § 903 (effective since 1978).  Regarding complicity, 18 Pa. Cons. Stat.

Ann. § 306 provides:

> (a) General Rule.  A person is guilty of an offense if it is
> committed by his own conduct or by the conduct of another person
> for which he is legally accountable, or both.
> (b) Conduct of another.  A person is legally accountable for the
> conduct of another when:
> . . .
> (3) he is an accomplice of such other person in the
> commission of the offense.
> (c) Accomplice defined.  A person is an accomplice of another
> person in the commission of an offense if:
> (1) with the intent of promoting or facilitating the
> commission of the offense
> . . .
> (ii) aids or agrees or attempts to aid such other
> person in planning or committing it.

18 Pa. Cons. Stat. Ann. § 306 (effective since 1973).

The Superior Court incorporated the trial court's opinion regarding the sufficiency of the

evidence to convict Paul.  Judge Cappellini found that Paul was an accomplice of Robert.  "A

principal and his accomplice share equal responsibility for their criminal acts."  Trial Ct. Op. at

19.  As the judge found, Paul drove the car to Jones' Bar, was aware that Robert had a rifle and

ammunition, drove the car to escape the scene of the crime, helped Robert to dispose of the

weapon, and then they jointly tried to create an alibi.  Paul did not pull the trigger, but his

behavior aided and assisted Robert's commission of the crime.

Judge Cappellini found the collusive behavior between Paul and Robert was tantamount

to a conspiracy.  According to the judge:

> [B]oth Defendants were aware of the reasons for returning to the
> scene of the original altercation for the purpose of Paul Powell
> engaging in a fair fight.  Paul Powell was aware his brother had the

40

> rifle to ensure a fair fight.  Both were aware at the time of the fatal
> shooting the purpose for their presence at the parking lot of Jones'
> Bar . . . .  Although no formal agreement to commit homicide
> could be found, the trier of fact could find collusive behavior
> between Defendants Paul L. Powell and Robert Powell.

Trial Op. at 16–17.

Given these facts, Paul fails to prove that no rational trier of fact could have found that he

met the requirements for both sections 306, complicity, and 903, conspiracy.  Considering the

record as a whole, in the light most favorable to the prosecution, a rational fact-finder could have

found the elements of these crimes for which Paul Powell was convicted beyond a reasonable

doubt.  The state court's decision was reasonable in light of the evidence, and was neither

contrary to, nor an unreasonable application of, clearly established federal law.

### CONCLUSION

We, as the federal habeas court, have "bent over backwards" trying to investigate the

claims of the Powell Brothers because it does appear that their cases were bungled in more ways

than one.  We have comprehensively pieced together the procedural and factual history, which

was not easy despite the many levels of review these cases have had.  We have read the record in

its entirety.  We have ordered the parties to supplement the record to ensure we had all

information needed to decide this case.  The Magistrate Judge held an evidentiary hearing

pursuant to Rule 8 of the Rules Governing § 2254 cases; it is rare for a federal court to hold such

an evidentiary hearing given the narrow scope of habeas review of state court cases.  Even the

Magistrate Judge determined that a cooperation agreement did in fact exist between the

prosecution and Eckhart, rejecting the factual determinations of the state court.  All of our efforts

have led us to conclude that (1) given the record before us and (2) given the federal habeas

review standards of state court decisions, we are precluded from offering the petitioners any form

of relief.  Although we may think that the state courts should have decided certain issues

differently, it is not our job to supplant the state court's decisions with our own.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PAUL POWELL, | : |
| Petitioner, | : |
| | : Case No. 3:05-CV-647 |
| v. | : |
| | : (Judge Kosik) |
| JAMES WYNDER, et al., | : |
| Respondents. | : |

| | |
|---|---|
| ROBERT POWELL, | : |
| Petitioner, | : |
| | : Case No. 3:05-CV-648 |
| v. | : |
| | : (Judge Kosik) |
| JAMES WYNDER, et al., | : |
| Respondents. | : |

## <u>ORDER</u>

AND NOW, this 30th day of September, 2008, IT IS HEREBY ORDERED THAT:

1. Paul and Robert Powell's petitions for writs of habeas corpus are DENIED;

2. The Clerk of Court is directed to CLOSE this case, and to forward a copy of our opinion to the Magistrate Judge;

3. Based on our conclusions herein, certificates of appealability will not be issued.


*s/Edwin M. Kosik*
United States District Judge